[No. B172449. Second Dist., Div. One. Oct. 21, 2004.]

HARTFORD CASUALTY INSURANCE COMPANY, Plaintiff and
Respondent, v.
MT. HAWLEY INSURANCE COMPANY, Defendant and Appellant.

## Counsel

Greco, Traficante & Edwards and Jon S. Brick for Defendant and Appellant.

Callahan, McCune & Willis and Janet C. Pesak for Plaintiff and Respondent.

## Opinion

**MALLANO, J.**—Under a construction contract, a subcontractor agreed to indemnify the general contractor for claims and liabilities arising out of the subcontractor's performance and to obtain a commercial general liability (CGL) policy listing the subcontractor as the named insured and the general contractor as an additional insured. The general contractor also had its own separate CGL policy, designating it as the named insured.

While the construction was in progress, an employee of the subcontractor was injured and filed suit against the general contractor. The subcontractor's insurer provided a defense and settled the case, using its own funds.

The subcontractor's insurer then filed this action against the general contractor's own insurer, seeking payment of one-half of the defense and settlement expenses. The general contractor's own insurer asserted it was not liable for contribution because, under the indemnity provision in the construction contract, the general contractor was not liable to the subcontractor in any amount. On cross-motions for summary judgment, the trial court agreed with the subcontractor's insurer and entered judgment against the general contractor's own insurer.

We conclude that, just as the general contractor is not liable to the subcontractor under the indemnity provision, so the general contractor's own insurer is not liable to the subcontractor's insurer. To hold otherwise would negate the indemnity provision in the construction contract. We therefore reverse.

# I

## BACKGROUND

Because this case comes to us on appeal from a grant of summary judgment, we treat as true all of the factual assertions and reasonable inferences supported by plaintiff's evidence. (See *Jackson v. County of Los Angeles* (1997) 60 Cal.App.4th 171, 179 [70 Cal.Rptr.2d 96].)

PCS/Cal-Mor (PCS) was the general contractor on a construction project commonly known as the Willis Project, located in Sherman Oaks, California. PCS was insured under a CGL policy obtained on its own, issued by Mt. Hawley Insurance Company (Mt. Hawley), effective May 27, 1999, to May 27, 2000.

On January 18, 2000, PCS entered into a subcontract with Kowalski Sheet Metal Inc., doing business as Valley Metal Supply (Valley Metal). The subcontract required Valley Metal to obtain a CGL policy for itself and to include coverage for PCS as an additional insured. Valley Metal fulfilled that obligation by purchasing a CGL policy from Hartford Casualty Insurance Company (Hartford), effective through April 27, 2000.

The subcontract also contained an indemnification provision, stating: "The Insurance maintained by [Valley Metal] . . . shall insure the performance of [Valley Metal's] indemnification obligations as set forth herein, but nothing in . . . the insurance . . . shall in any way limit the indemnification provided for hereunder. To the fullest extent permitted by law, [Valley Metal] shall defend, indemnify and hold [PCS] . . . harmless from and against any and all costs, liabilities, losses, expenses, liens, claims, demands and causes of action of every kind and character []including those of [Valley Metal], its agents and employees for death, bodily injury, [and] personal injury . . . including costs, attorneys' fees and settlements arising out of or in any way connected with the performance of Work under this Subcontract, by act or omission, whether performed by [Valley Metal] or any other Subcontractor or any independent contractor or any agent, employee, invitee or licensee of [Valley Metal], whether resulting from or contributed to by . . . negligence in any form, whether active or passive, except the sole negligence or willful misconduct of [PCS] . . . ."

On March 3, 2000, an employee of Valley Metal, Jack Cortez, was injured at the jobsite while attempting to carry materials to the roof of a partially constructed building. Cortez was at the site for the first time. He was following his supervisor, also employed by Valley Metal, to a stairway. They came to an unlit area where Cortez fell four to six feet to the bottom of an open elevator shaft. He injured his left wrist severely, requiring surgery and extensive therapy.

Cortez received workers' compensation benefits from Valley Metal's carrier, Fremont Compensation Insurance Company. Fremont in turn filed suit against PCS to recover $17,000 in benefits already paid and estimated future benefits of about $23,000 (*Fremont Compensation Insurance Co. v. PCS/Cal-Mor* (Super. Ct. L.A. County, 2001, No. LC054731)). Cortez filed a complaint in intervention against PCS, seeking damages for personal injuries.[1]

PCS contacted its general liability insurer, Mt. Hawley. Pursuant to the insurance and indemnity provisions of the subcontract, Mt. Hawley tendered defense of the suit to Valley Metal's general liability insurer, Hartford. On February 9, 2001, Hartford accepted the defense of the action and assigned the case to the law firm of Cline & Associates. Cline filed separate answers to Fremont's and Cortez's complaints. Cline also filed a cross-complaint against Cal-State Electric, the subcontractor allegedly responsible for lighting at the jobsite, contending that Cal-State failed to provide adequate lighting in the area where Cortez fell, thus causing the accident.

Subsequent correspondence between Hartford and Mt. Hawley addressed, but failed to resolve, the issue of whether Hartford would provide PCS with indemnity. Eventually, by letter to PCS dated January 31, 2002, Mary Johnson, a claim consultant with Hartford, stated: "The Hartford hereby agrees to indemnify [you] in [the pending action]. Per the indemnity provision in the contract, full indemnification will be provided except for [your] sole negligence or willful misconduct . . . ."

On January 30, 2002, Hartford tendered the defense of the case to Cal-State Electric's insurer, Reliance Insurance Company, based on an indemnity provision in the subcontract between PCS and Cal-State Electric. Reliance was in liquidation, and the California Insurance Guarantee Association, which was representing Cal-State Electric, denied the tender.

---

[1] In certain situations, the injured employee of a subcontractor cannot maintain an action for damages against the general contractor but is limited to workers' compensation benefits. (See *Privette v. Superior Court* (1993) 5 Cal.4th 689 [21 Cal.Rptr.2d 72, 854 P.2d 721]; *Toland v. Sunland Housing Group, Inc.* (1998) 18 Cal.4th 253 [74 Cal.Rptr.2d 878, 955 P.2d 504]; see generally *Lopez v. C.G.M. Development, Inc.* (2002) 101 Cal.App.4th 430, 437–442 [124 Cal.Rptr.2d 227] [discussing cases].) The parties do not discuss this principle, so neither do we.

On April 15, 2002, Johnson spoke with defense counsel at Cline and evaluated the case for purposes of settlement. In her typed "roundtable" notes of the same date, Johnson stated, "Per the contract, Hartford policy is primary and indemnification is owed for all except sole negligence or willful misconduct of [PCS]."[2] Johnson also allocated fault among those involved in the accident, estimating that PCS was 40 to 50 percent negligent, Cal-State Electric was 20 percent negligent, Valley Metal was 30 to 35 percent negligent, and Cortez was 10 percent negligent, if at all.

The next day, Johnson prepared a "Reserve Memo" for Hartford's home office, essentially repeating the information from her roundtable notes, estimating PCS's negligence at 40 to 50 percent and stating that "[i]ndemnification is owed to [PCS] except for claims arising from sole negligence or willful misconduct of [PCS]."

The superior court ordered the case to mediation. Johnson sent a memo to Hugh Downes, an independent adjuster, asking him to attend the mediation on Hartford's behalf. The memo noted that "Hartford is defending general contractor, [PCS], per their status as an additional insured. Per the contract, Hartford policy is primary and indemnification is owed for all except sole negligence or willful misconduct of [PCS]." The memo also discussed how PCS, Cal-State Electric, and Valley Metal were each negligent in causing the accident.

By letter dated April 17, 2002, coverage counsel for Hartford encouraged Mt. Hawley to participate in the mediation, stating that "a jury could easily feel sorry for Mr. Cortez and solely blame [PCS] for the inadequate lighting and for their failure to barricade an open ditch. . . . [I]t is our position that Mt. Hawley Insurance Company is facing a large potential exposure, and they should participate and contribute toward a resolution of this claim."

The mediation was held on April 25, 2002. Hartford settled Cortez's complaint in intervention for $240,000. On April 26, 2002, Johnson received an e-mail from Cline, asking that she process the settlement check. Hartford funded the entire settlement.

After the settlement with Cortez, Hartford pursued settlement of Fremont's workers' compensation lien. The matter was submitted to mediation. Johnson

---

[2] " 'Primary coverage is insurance coverage whereby, under the terms of the policy, liability attaches immediately upon the happening of the occurrence that gives rise to liability. . . . [¶] "Excess" or secondary coverage is coverage whereby, under the terms of the policy, liability attaches only after a predetermined amount of primary coverage has been exhausted.' " (Century Surety Co. v. United Pacific Ins. Co. (2003) 109 Cal.App.4th 1246, 1255 [135 Cal.Rptr.2d 879], some italics omitted.)

was still of the opinion that Cortez's employer, Valley Metal, was partly at fault for the accident. On May 6, 2002, Cline sent Johnson an e-mail, stating that Fremont had accepted a settlement offer of $15,000. Hartford paid the entire amount.

On November 18, 2002, Hartford filed this action against Mt. Hawley, seeking declaratory relief, contribution, and indemnity based on the amounts Hartford had paid to defend and settle the lawsuit by Cortez and Fremont. Neither of the insureds, PCS and Valley Metal, was sued. The complaint alleged that Cortez's injuries were caused by the sole negligence of PCS. It was further alleged that the respective insurance policies contained identical "other insurance" provisions, stating when coverage would be primary or excess and describing how multiple insurers would contribute toward defense costs and indemnity.[3]

Both insurers filed cross-motions for summary judgment. Hartford argued that Mt. Hawley was liable for one-half of the defense and settlement expenses under a theory of equitable contribution. Mt. Hawley asserted that, because PCS was not solely negligent in causing Cortez's injuries, the

---

[3] The "other insurance" provisions state: "**Other Insurance.** [¶] If other valid and collectible insurance is available to the insured for a loss we cover under Coverages A[, for bodily injury and property damage,] or B[, for personal and advertising injury,] . . . our obligations are limited as follows: [¶] **a. Primary Insurance** [¶] This insurance is primary except when b. below applies. If this insurance is primary, our obligations are not affected unless any of the other insurance is also primary. Then, we will share with all that other insurance by the method described in c. below. [¶] **b. Excess Insurance** [¶] This insurance is excess over any of the other insurance, whether primary, excess, contingent or on any other basis: [¶] (1) That is Fire, Extended Coverage, Builder's Risk, Installation Risk or similar coverage for 'your work'; [¶] (2) That is Fire insurance for premises rented to you or temporarily occupied by you with permission of the owner; or [¶] (3) If the loss arises out of the maintenance or use of aircraft, 'autos' or watercraft to the extent not subject to Exclusion g. of Coverage A (Section I). [¶] When this insurance is excess, we will have no duty under Coverages A or B to defend the insured against any 'suit' if any other insurer has a duty to defend the insured against that 'suit.' If no other insurer defends, we will undertake to do so, but we will be entitled to the insured's rights against all those other insurers. [¶] When this insurance is excess over other insurance, we will pay only our share of the amount of the loss, if any, that exceeds the sum of: [¶] (1) The total amount that all such other insurance would pay for the loss in the absence of this insurance; and [¶] (2) The total of all deductible and self-insured amounts under all that other insurance. [¶] We will share the remaining loss, if any, with any other insurance that is not described in this Excess Insurance provision and was not bought specifically to apply in excess of the Limits of Insurance shown in the Declarations of this Coverage Part. [¶] **c. Method of Sharing** [¶] If all of the other insurance permits contribution by equal shares, we will follow this method also. Under this approach each insurer contributes equal amounts until it has paid its applicable limit of insurance or none of the loss remains, whichever comes first. [¶] If any of the other insurance does not permit contribution by equal shares, we will contribute by limits. Under this method, each insurer's share is based on the ratio of its applicable limit of insurance to the total applicable limits of insurance of all insurers." (Boldface added.)

indemnity provision in the subcontract obligated Valley Metal to indemnify PCS. Thus, according to this argument, Valley Metal's insurer, Hartford, could not obtain contribution from PCS's insurer, Mt. Hawley. The trial court granted Hartford's summary judgment motion, denied Mt. Hawley's motion, and awarded Hartford $136,479.39, plus interest. Mt. Hawley appealed.

## II

## DISCUSSION

██ A motion for summary judgment must be granted if all the papers submitted show that there is no triable issue as to any material fact and that the moving party is entitled to judgment as a matter of law. (Code Civ. Proc., § 437c, subd. (c).)

" 'A defendant seeking summary judgment has met the burden of showing that a cause of action has no merit if that party has shown that one or more elements of the cause of action cannot be established [or that there is a complete defense to that cause of action]. . . . In reviewing the propriety of a summary judgment, the appellate court independently reviews the record that was before the trial court. . . . We must determine whether the facts as shown by the parties give rise to a triable issue of material fact. . . . [T]he moving party's affidavits are strictly construed while those of the opposing party are liberally construed.' . . . We accept as undisputed facts only those portions of the moving party's evidence that are not contradicted by the opposing party's evidence. . . . In other words, the facts [supported by] the evidence of the party opposing summary judgment and the reasonable inferences therefrom must be accepted as true." (*Jackson v. County of Los Angeles*, *supra*, 60 Cal.App.4th at pp. 178–179, citations omitted.)

"[T]he party moving for summary judgment bears an initial burden of production to make a prima facie showing of the nonexistence of any triable issue of material fact; if he carries his burden of production, he causes a shift, and the opposing party is then subjected to a burden of production of his own to make a prima facie showing of the existence of a triable issue of material fact. . . .

"[H]ow the parties moving for, and opposing, summary judgment may each carry their burden of . . . production depends on *which* would bear *what* burden of proof at trial." (*Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 850–851 [107 Cal.Rptr.2d 841, 24 P.3d 493], italics in original.)

A. *Subrogation and Contribution*

██ An insurer that has paid defense and settlement expenses may pursue reimbursement from other insurers on various equitable grounds, including

subrogation and contribution. (See Croskey et al., Cal. Practice Guide: Insurance Litigation (The Rutter Group 2004) ¶¶ 8:65 to 8:65.1, pp. 8-19 to 8-21.) Hartford contends it is entitled to contribution from Mt. Hawley. For its part, Mt. Hawley argues that Hartford is not entitled to payment on any basis.

"Subrogation is defined as the substitution of another person in place of the creditor or claimant to whose rights he or she succeeds in relation to the debt or claim. By undertaking to indemnify or pay the principal debtor's obligation to the creditor or claimant, the 'subrogee' is equitably *subrogated* to the claimant (or 'subrogor'), and succeeds to the subrogor's rights against the obligor. . . . In the case of insurance, subrogation takes the form of an insurer's right to be put in the position of the insured in order to pursue recovery from third parties legally responsible to the insured for a loss which the insurer has both insured and paid. . . . ' "As now applied [the doctrine of equitable subrogation] is broad enough to include every instance in which one person, not acting as a mere volunteer or intruder, pays a debt for which another is primarily liable, and which in equity and good conscience should have been discharged by the latter." . . .' . . . [¶] . . . [¶]

"The right of subrogation is purely derivative. An insurer entitled to subrogation is in the same position as an assignee of the insured's claim, and succeeds only to the rights of the insured. The subrogated insurer is said to ' "stand in the shoes" ' of its insured, because it has no greater rights than the insured and is subject to the same defenses assertable against the insured. Thus, an insurer cannot acquire by subrogation anything to which the insured has no rights, and may claim no rights which the insured does not have. . . .

"Equitable contribution is entirely different. It is the right to recover, not from the party *primarily* liable for the loss, but from a *co-obligor* who *shares* such liability with the party seeking contribution. In the insurance context, the right to contribution arises when several insurers are obligated to indemnify or defend the same loss or claim, and one insurer has paid more than its share of the loss or defended the action without any participation by the others. Where multiple insurance carriers insure the same insured and cover the same risk, each insurer has independent standing to assert a cause of action against its coinsurers for equitable contribution when it has undertaken the defense or indemnification of the common insured. Equitable contribution permits reimbursement to the insurer that paid on the loss for the excess it paid over its proportionate share of the obligation, on the theory that the debt it paid was *equally* and *concurrently* owed by the other insurers and should be shared by them pro rata in proportion to their respective coverage of the risk. The purpose of this rule of equity is to accomplish substantial justice by equalizing the common burden shared by coinsurers, and to prevent one insurer from profiting at the expense of others. . . .

"This right of equitable contribution belongs to each insurer individually. It is not based on any right of subrogation to the rights of the insured, and is not equivalent to ' "standing in the shoes" ' of the insured. . . . Instead, the reciprocal contribution rights of coinsurers who insure the same risk are based on the equitable principle that the burden of indemnifying or defending the insured with whom each has independently contracted should be borne by all the insurance carriers together, with the loss equitably distributed among those who share liability for it in direct ratio to the proportion each insurer's coverage bears to the total coverage provided by all the insurance polices [*sic*]. . . . 'As a matter of equity, insurers of the "same risk" may sue each other for contribution. . . . This right is not a matter of contract, but flows " 'from equitable principles designed to accomplish ultimate justice in the bearing of a specific burden.' " . . . The idea is that the insurers are "equally bound," so therefore they "all should contribute to the payment." . . .' . . .

"Unlike subrogation, the right to equitable contribution exists *independently* of the rights of the insured. It is predicated on the commonsense principle that where multiple insurers or indemnitors share equal contractual liability for the primary indemnification of a loss or the discharge of an obligation, the selection of which indemnitor is to bear the loss should not be left to the often arbitrary choice of the loss claimant, and no indemnitor should have any incentive to avoid paying a just claim in the hope the claimant will obtain full payment from another coindemnitor. . . . [¶] . . . [¶]

"The different equitable principles on which contribution and subrogation are based are reflective of different underlying public policies. The aim of equitable subrogation is to place the burden for a loss on the party ultimately liable or responsible for it and by whom it should have been discharged, and to relieve entirely the insurer or surety who indemnified the loss and who in equity was *not* primarily liable therefor. . . . On the other hand, the aim of equitable contribution is to apportion a loss between two or more insurers who cover the same risk, so that each pays its fair share and one does not profit at the expense of the others." (*Fireman's Fund Ins. Co. v. Maryland Casualty Co.* (1998) 65 Cal.App.4th 1279, 1291–1296 [77 Cal.Rptr.2d 296], citations and fn. omitted, italics in original; see *Maryland Casualty Co. v. Nationwide Mutual Ins. Co.* (2000) 81 Cal.App.4th 1082, 1092 [97 Cal.Rptr.2d 374] [equitable contribution, not subrogation, applies where construction contract does not contain indemnity provision].)

B. *Effect of the Indemnity Provision*

 As stated, Hartford relies on equitable contribution in arguing that Mt. Hawley is liable for one-half of the defense and settlement expenses. Mt. Hawley contends that equitable contribution is precluded because its

insured, PCS, is not liable to Valley Metal, Hartford's insured, by operation of the indemnity provision. As a general matter, "the courts will assess whether the factual circumstances 'create[] a relationship between the indemnity contract and the insurance allocation issues . . . .' " (*Travelers Casualty & Surety Co. v. American Equity Ins. Co.* (2001) 93 Cal.App.4th 1142, 1154 [113 Cal.Rptr.2d 613] (*Travelers*).)

Hartford seeks to obtain equitable contribution from Mt. Hawley notwithstanding the indemnity provision in the subcontract between PCS and Valley Metal, which reads: "The Insurance maintained by [Valley Metal] . . . shall insure the performance of [Valley Metal's] indemnification obligations as set forth herein, but nothing in . . . the insurance . . . shall in any way limit the indemnification provided for hereunder. To the fullest extent permitted by law, [Valley Metal] shall defend, indemnify and hold [PCS] . . . harmless from and against any and all costs, liabilities, losses, expenses, liens, claims, demands and causes of action . . . arising out of or in any way connected with the performance of Work under this Subcontract, . . . except the sole negligence or willful misconduct of [PCS] . . . ."

Thus, Valley Metal agreed to indemnify and hold PCS harmless absent PCS's sole negligence or willful misconduct. PCS had no contractual duty to indemnify Valley Metal. Hartford was undoubtedly aware of the indemnity provision throughout the underlying litigation as it repeatedly stated in writing that "[p]er the contract, Hartford policy is primary and indemnification is owed for all except sole negligence or willful misconduct of [PCS]," or words to that effect. Indeed, in the complaint *in this action*, Hartford alleged that PCS was solely negligent in causing Cortez's injuries, thus acknowledging the effect of the indemnity provision. Yet, Hartford now argues that the indemnity provision is irrelevant and that principles of equitable contribution are controlling.

In *Rossmoor Sanitation, Inc. v. Pylon, Inc.* (1975) 13 Cal.3d 622 [119 Cal.Rptr. 449, 532 P.2d 97] (*Rossmoor*), the Supreme Court rejected that very argument. There, a property owner, Rossmoor Sanitation, Inc. (Owner), employed a contractor, Pylon, Inc. (Contractor), to construct a sewage pump station and sewer lines. Although the Owner already had insurance through Insurance Company of North America (Owner's insurer or INA), the construction contract required the Contractor to obtain a CGL policy and to include the Owner as an additional insured. To that end, the Contractor obtained insurance from United States Fire Insurance Company (Contractor's insurer or U.S. Fire). The contract also obligated the Contractor to indemnify and hold the Owner harmless against all claims for damages arising out of the work. Both insurance policies contained "other insurance" provisions calling for apportionment if the insured had other insurance against a loss covered by the policy.

Two of the Contractor's employees were working in an open trench when it caved in, injuring one employee and killing the other. In a suit against the Owner by the injured employee and the heirs of the deceased worker, the plaintiffs recovered a judgment of around $267,000, plus costs of suit and other expenses. The Owner's insurer paid those amounts.

The Owner then brought an action against the Contractor and the Contractor's insurer, seeking declaratory relief and indemnification for the amounts paid in the prior action. The Contractor's insurer filed a cross-complaint against the Owner's insurer, seeking to apportion the amounts between the two insurers pursuant to the "other insurance" provisions. The trial court found that the terms of the indemnity provision in the contract were sufficiently clear to cover the accident; the Owner's negligence, if any, was passive; neither the Contractor nor the Contractor's insurer was entitled to any benefits or setoffs by reason of the Owner's coverage; and the Owner's insurer and the Contractor's insurer were subrogated to the rights of their respective insureds, enabling the Owner's insurer to benefit from the indemnity provision. The trial court entered judgment in favor of the Owner and its insurer.

On appeal, the Supreme Court affirmed, stating:

"Where, as here, the parties have expressly contracted with respect to the duty to indemnify, the extent of that duty must be determined from the contract and not by reliance on the independent doctrine of equitable indemnity. . . . [¶] . . . [¶]

"[T]he question whether an indemnity agreement covers a given case turns primarily on contractual interpretation, and it is the intent of the parties as expressed in the agreement that should control. When the parties knowingly bargain for the protection at issue, the protection should be afforded. This requires an inquiry into the circumstances of the damage or injury and the language of the contract; of necessity, each case will turn on its own facts.

"Under the indemnity agreement in the present case, [the Owner] is not to be held accountable for any loss or injury to any person occurring during construction undertaken by [the Contractor], and [the Contractor] has agreed to indemnify [the Owner] for all claims arising out of its execution of the work. It is a reasonable and practical conclusion that the parties bargained for the protection here at issue, given the language of the contract and the facts, as found by the trial court, that the accident resulted from [the Contractor's] inadequate execution of the work, not from any active negligence by [the Owner]. Since the accident may be seen as one of the risks against which [the Owner] sought to be covered, [the Owner] is entitled to the protection it seeks under the agreement.

"Generally, an insurer on paying a loss is subrogated in a corresponding amount to the insured's right of action against any person responsible for the loss. . . . California law is in accord that insurance companies may be subrogated to the rights of their insureds. . . . It would appear, therefore, that the trial court could properly find that [the Owner's insurer] was subrogated to [the Owner's] right of indemnification since [the Owner's insurer] paid the . . . judgment for [the Owner] and since [the Owner] has a right of indemnity against [the Contractor].

"[The Contractor and its insurer], however, cite [case law] for the proposition that the terms of the insurance contracts requiring proration in case of other insurance should control, rather than the right to indemnification that exists between the parties insured by the contracts. Under the circumstances of the present case, we cannot agree. . . . The case at bar concerns a contractual indemnity agreement, not theoretical noncontractual rights of indemnification between insureds. . . .

"It appears that both [of the insurers] calculated and accepted premiums with knowledge that they might be called upon to satisfy a full judgment. There is no evidence that either company knew there was or would be other insurance when they issued the policies. The fact that there is other insurance is a mere fortuitous circumstance. *We view one factor as compelling, however: to apportion the loss in this case pursuant to the other insurance clauses would effectively negate the indemnity agreement and impose liability on [the Owner's insurer] when [the Owner] bargained with [the Contractor] to avoid that very result as part of the consideration for the construction agreement.* We therefore conclude that the rights of indemnity and subrogation must control, and are persuaded the trial court was correct in finding that because the [Contractor's] policy was part of the consideration for the construction job, it must be viewed as primary insurance under the facts of this case and that [the Owner's insurer] was subrogated to the rights of [the Owner]." (*Rossmoor*, *supra*, 13 Cal.3d at pp. 628–635, citations omitted, italics added.)

Similarly, in this case, the indemnity provision in the subcontract stated that PCS would not be liable for any claims or damages unless caused by its sole negligence or willful misconduct. In its complaint, Hartford alleged that PCS was solely negligent in causing the accident. The complaint did not allege nor does Hartford contend on appeal that PCS engaged in willful misconduct. In moving for summary judgment, Mt. Hawley established as an undisputed fact that PCS was not solely negligent. In that regard, Hartford's claims consultant, Mary Johnson, consistently stated that, at most, PCS was 40 to 50 percent negligent, with Valley Metal, Cal-State Electric, and possibly Cortez bearing the rest of the fault. Valley Metal included PCS as an

additional insured under the Hartford policy as part of the consideration for the construction job. And it appears both insurers knew that they might have to satisfy a full judgment. In short, the indemnity provision precludes any recovery by Valley Metal against PCS.

As *Rossmoor* instructs, the indemnity provision would be effectively negated if Valley Metal's insurer, Hartford, were permitted to recover against PCS's insurer, Mt. Hawley, pursuant to the insurance policies' "other insurance" provisions or the doctrine of equitable contribution. (See *Rossmoor, supra,* 13 Cal.3d at pp. 626–628 & fn. 2, 634.) Hartford seemingly agreed that it could not recover against Mt. Hawley by repeatedly representing to PCS in the underlying litigation that, *because of the subcontract,* PCS was not liable for any damages, and Valley Metal was to hold PCS harmless except for PCS's sole negligence or willful misconduct—exceptions that, based on the complaint in this action and Mt. Hawley's summary judgment motion, do not apply as a matter of law.

To require Mt. Hawley to pay Hartford $136,479.39, plus interest, when Mt. Hawley's insured, PCS, is not liable for anything due to the indemnity provision, is inconsistent with " ' "equitable principles designed to accomplish ultimate justice," ' " is not "predicated on [any] commonsense principle," and does not further the goal that each insurer pay its *"fair* share." (*Fireman's Fund Ins. Co. v. Maryland Casualty Co., supra,* 65 Cal.App.4th at pp. 1295, 1296, italics added.) Hartford acknowledged in the underlying case that its defense and indemnity obligations to PCS were dictated by the subcontract. But in this case, Hartford attempts to invoke principles of equity to negate the subcontract and collect from Mt. Hawley.

Just as Valley Metal has no right of recovery against PCS, so Valley Metal's insurer, Hartford, has no right to recover from PCS's insurer, Mt. Hawley. It would be unjust to "impose liability on [Mt. Hawley] when [PCS] bargained with [Valley Metal] to avoid that very result as part of the consideration for the construction agreement." (*Rossmoor, supra,* 13 Cal.3d at p. 634.) Hartford does not point to any language in the subcontract or the insurance policies suggesting otherwise.

As one leading treatise has stated: "In a variety of commercial relationships, such as . . . contractor-subcontractor, the contracts between the parties contain indemnification agreements in which one agrees to hold the other harmless for its own acts of negligence or that of its employees. Such contractual arrangements can nullify a right to contribution." (15 Couch on Insurance (3d ed. 1999) § 218:19, p. 218-25.) Similarly, "an indemnity agreement between the insureds or a contract with an indemnification clause, such as is commonly found in the construction industry, may shift an entire

loss to a particular insurer notwithstanding the existence of an 'other insurance' clause in its policy." (*Id.*, § 219:1, p. 219-7.)

█ And *Rossmoor* does not stand alone. Other courts have concluded that indemnity agreements, not policy provisions, may determine the right to contribution. In *Continental Cas. Co. v. Auto-Owners Ins. Co.* (8th Cir. 2000) 238 F.3d 941 (*Continental*), Burlington Northern Railway (Owner) contracted with Fitzsimmons Service Company (Contractor) to salvage goods from some derailed cars. The Owner was insured by Interstate Fire and Casualty Company (Owner's insurer), and the Contractor was insured by Auto-Owners Insurance Company (Contractor's insurer). In the Owner-Contractor agreement, the Contractor agreed to indemnify the Owner with respect to claims of injury arising out of the work performed under the agreement. One of the Contractor's employees was injured and sued the Owner. The case settled, and the settlement was funded by both insurers. In a declaratory relief action between the insurers only, the district court ruled that they both had to contribute to the settlement.

The court of appeals reversed. It first determined that both insurers had covered the loss. It then looked to the indemnity agreement between the Owner and the Contractor—in which the Contractor had agreed to hold the Owner harmless from any and all claims of injury—and concluded that the Contractor's insurer was obligated to bear the entire loss. As the court pointed out, "The present action . . . is founded not just on the insurance policies but also on the agreements between [the Owner] and its [C]ontractor[]." (*Continental, supra*, 238 F.3d at p. 945 [applying Minnesota law].)

In *Wal-Mart Stores, Inc. v. RLI Ins. Co.* (8th Cir. 2002) 292 F.3d 583 (*Wal-Mart*), a retailer, Wal-Mart, entered into a contract with a distributor, Cheyenne Industries, Inc. (Distributor), for the delivery and retail sale of halogen lamps. The contract stated that the Distributor would indemnify Wal-Mart against any liability resulting from the sale of the product. The contract also required the Distributor to have at least $2 million in liability insurance.

The Distributor was covered by two insurance policies. St. Paul Surplus Lines Insurance Company (Distributor's first insurer) provided primary coverage with a $1 million limit; RLI Insurance Company (Distributor's second insurer) issued a policy with a $10 million limit that contained an "other insurance" clause stating that the policy was excess as to any other "unscheduled" insurance of the insured. Wal-Mart was insured under both of the Distributor's policies.

In addition, Wal-Mart had its own insurance from National Union Insurance Company (Wal-Mart's insurer), which had a $10 million limit. Wal-Mart's insurance policy was not scheduled insurance on the Distributor's second policy and contained an "other insurance" clause, stating that Wal-Mart's coverage was " '. . . excess over any of the other insurance . . . bought specifically for an Insured.' " (*Wal-Mart, supra,* 292 F.3d at p. 587.)

An allegedly defective lamp, which originated with the Distributor and was purchased at Wal-Mart, caused a fire, resulting in personal injuries. A lawsuit followed, brought against Wal-Mart, the Distributor, and others. The case settled for $11 million. The Distributor's first insurer paid $1 million of the settlement, and its second insurer paid the remaining $10 million. All parties agreed that the Distributor's first insurer was liable for the first $1 million of the settlement. They disagreed about the allocation of the $10 million.

Wal-Mart and its insurer filed a declaratory relief action to determine if they were liable to the Distributor's second insurer for any portion of the outstanding sum. The district court held that, by virtue of the "other insurance" provision in the Distributor's second policy, the Distributor's coverage was secondary to Wal-Mart's insurance, and Wal-Mart and its insurer were therefore liable for the full $10 million.

The court of appeals reversed, stating:

"[T]he indemnity agreement controls the outcome, not the 'other insurance' clauses. . . . [E]xamination of the relationships between the parties has convinced us that [the Distributor] intended to and did make a valid promise to indemnify Wal-Mart for claims arising from the halogen lamps, and that [the Distributor's second insurer] provided liability insurance to [the Distributor] that covers both the . . . settlement and [the Distributor's] indemnification obligation. In this situation we think consideration of the indemnity agreement reflects the intention of the parties and does not unfairly prejudice the insurers. . . . [¶] . . . [¶]

"The language of the provisions is clear. [The Distributor] has promised to indemnify Wal-Mart for any liability or loss resulting from Wal-Mart's sale of its lamps. . . . [¶] . . . [¶]

"Notwithstanding [the Distributor's] obligation, [the Distributor's second insurer] urges this Court that the indemnification provision is irrelevant to this case. It contends that only the language of insurance policies determine[s] the priority of payment between insurers. We reject this argument. . . . [¶] . . . [¶]

"[Wal-Mart's insurer] and Wal-Mart point this Court to cases from several jurisdictions holding that an indemnity agreement prevents the indemnitee's insurer from being liable for a settlement arising from a covered loss. Our own Court has recently reached this conclusion in *Continental*[, *supra,*] 238 F.3d 941 . . . .

"We think [*Continental*] provides strong support for our conclusion that [the Distributor's second insurer] must bear the entire loss for the . . . settlement. . . ." (*Wal-Mart, supra*, 292 F.3d at pp. 587–589, fn. omitted [applying Arkansas law].)

Lastly, in *Wal-Mart, supra*, 292 F.3d at pages 591–592, the court discussed *Rossmoor, supra*, 13 Cal.3d 622, stating in part: "We read *Rossmoor* to stand for the proposition that, when an indemnity agreement is put at issue by a party in an insurance-allocation dispute, the effect and purpose of such an indemnity agreement may govern the allocation of liability, despite policy language that would require a different result." (*Wal-Mart, supra*, 292 F.3d at p. 592.)

In *American Indem. Lloyds v. Travelers Property* (5th Cir. 2003) 335 F.3d 429, Elite Masonry, Inc. (the Subcontractor), entered into an agreement with Caddell Construction Company (the General Contractor), to provide masonry services in the construction of a prison in Texas. The Subcontractor agreed to indemnify and hold the General Contractor harmless from any and all claims and liabilities arising out of the work performed under the agreement unless there was a judicial determination that the injury, death, or damage was attributable solely to the fault or negligence of the General Contractor.

Pursuant to the agreement, the Subcontractor obtained a CGL policy from American Indemnity Lloyds (Subcontractor's insurer) with itself as the named insured and the General Contractor as an additional insured. The General Contractor purchased a separate policy of its own from Travelers Property & Casualty Insurance Company (General Contractor's insurer) on which it was the named insured. Both policies contained the same "other insurance" provisions, which are virtually identical to those in the present case.

An employee of the subcontractor was injured on the job and filed suit against both contractors. Upon request, the Subcontractor's insurer defended the General Contractor. The Subcontractor was dismissed from the suit, and the action went forward as to the General Contractor. The Subcontractor's insurer settled the case for $625,000, using its own funds, and incurred around $230,164 in attorney fees and costs in defending the General Contractor.

The Subcontractor's insurer filed suit against the General Contractor's insurer, seeking one-half of the defense and settlement expenses. The insurers filed cross-motions for summary judgment. The Subcontractor's insurer relied on the "other insurance" provisions in the two policies in arguing for contribution. The General Contractor's insurer argued against contribution, relying on the indemnity provision in the construction agreement and pointing

out that there had not been a judicial determination that the General Contractor was solely at fault or negligent, either in the underlying action or the instant action. The district court granted summary judgment in favor of the General Contractor's insurer.

On appeal, the Fifth Circuit affirmed, relying in large part on *Wal-Mart*, *supra*, 292 F.3d 583, and *Rossmoor*, *supra*, 13 Cal.3d 622. (See *American Indem. Lloyds v. Travelers Property*, *supra*, 335 F.3d at pp. 436–438.) The court concluded that, because the Subcontractor had to indemnify the General Contractor under the construction agreement, the Subcontractor's insurer could not obtain contribution from the General Contractor's insurer. (See *id.* at pp. 435–440 & fn. 12 [applying Texas law]; accord, *Aetna Insurance Co. v. Fidelity & Cas. Co. of New York* (5th Cir. 1973) 483 F.2d 471 [where property owner hired contractor, and contractor's employee was injured while working on owner's property, owner's insurer did not owe contribution to contractor's insurer; indemnity provision in construction contract required contractor to indemnify owner and controlled over provisions in insurance policies].)

In *American Indem. Lloyds v. Travelers Property*, *supra*, 335 F.3d 429, the Fifth Circuit also stated that, under California law, an indemnity provision in a construction contract will not be enforced unless there is a judicial determination of fault, namely, whether the indemnitee is solely at fault. (See *id.* at pp. 441–443, discussing *Travelers*, *supra*, 93 Cal.App.4th 1142; Civ. Code, § 2782.) As noted, here, in moving for summary judgment, Mt. Hawley established that PCS was not solely to blame for Cortez's injuries.

More recently, in *St. Paul Fire Ins. v. Am. Intern. Spec. Lines* (4th Cir. 2004) 365 F.3d 263 (*St. Paul*), the owner of a vacation resort, VMS Lansdowne Limited Partnership (Owner), entered into a management agreement with Benchmark Management Company (Operator). Under the agreement, the Owner agreed to indemnify the Operator for liability arising out of negligence, and the Operator agreed to indemnify the Owner for liability arising out of gross negligence, fraud, or willful conduct. One of the resort's guests became ill, allegedly as a result of food poisoning, and filed suit against the Owner and the Operator (defendants). The case settled, funded by the defendants' insurers.

The defendants' insurers then joined in a declaratory relief action to determine issues of coverage and expense allocation. The district court concluded that all of the Owner's and Operator's insurers were obligated to contribute to the settlement. The Operator's insurers appealed, contending that they were not liable for any portion of the settlement. The court of appeals agreed and reversed, concluding that the incident of alleged food poisoning

was caused by ordinary negligence, which, under the indemnity provision in the management agreement, made the Owner liable to the Operator. As the court explained:

"[The Operator's insurers] argue that the [Owner's insurance] policies must respond first to satisfy the settlement because the [management agreement] requires [the Owner] to indemnify [the Operator] . . . . In this regard, [the Operator's insurers] rely on cases that give priority to indemnification agreements between the insured[s] in assessing the respective obligations of the insurers and hold that such agreements may prevent the indemnitee's insurer from being liable for a settlement arising from a covered loss, notwithstanding the existence of an 'other insurance' clause in the indemnitor's insurance policy . . . .

"We agree with [the Operator's insurers] . . . . [W]e conclude that the indemnification provisions control the allocation of liability between the insurers in this case because it results in [the Owner] having responsibility for the [Operator's] share[] of the settlement. . . . [¶] . . . [¶]

"[A]ll indications are that most, if not all, jurisdictions to have faced the question of whether an indemnification agreement could relieve particular insurers of an obligation to pay . . . have answered in the affirmative. . . .

"[W]e believe that the cases and principles relied on in *Wal-Mart*[, *supra*, 292 F.3d 583,] . . . represent general practices and the majority position on the respective issues . . . ." (*St. Paul, supra*, 365 F.3d at pp. 270–272 [applying Virginia law].)

And in *Chubb Ins. Co. of Canada v. Mid-Continent Cas. Co.* (S.D. Miss. 1997) 982 F.Supp. 435 (*Chubb*), the operator of an oil well, Coho Resources, Inc. (Operator), contracted with Smith Brothers, Inc. (Contractor), to perform certain tasks. The Operator was insured by Chubb Insurance Company of Canada (Operator's insurer), and the Contractor was insured by Mid-Continent Casualty Company (Contractor's insurer). During the work, the Contractor's rig overturned, injuring one of its employees and killing another. The injured employee and the estate of the deceased employee sued the Operator.

Under an indemnity agreement, the Contractor had agreed to defend, indemnify, and hold the Operator harmless in the event of such litigation. The Operator and its insurer filed a declaratory relief action against the Contractor and its insurer, contending that the Contractor's insurer had the primary obligation to defend the Operator "without regard to any insurance which [the Operator] might have." (*Chubb, supra*, 982 F.Supp. at p. 437.) The Contractor's insurer argued that, pursuant to the "other insurance" provisions in the two policies, the insurers had to contribute in equal amounts up to the policy limits.

The court agreed with the Operator and its insurer. (*Chubb, supra,* 982 F.Supp. at p. 437.) Citing *Rossmoor, supra,* 13 Cal.3d 622, the court explained: "[The Contractor's] liability to [the Operator] for the . . . suits and any judgment which might be imposed against [the Operator] is determined by the indemnity agreement, and to the extent that [the Contractor] is liable to [the Operator] for indemnity, so, too, are its insurers, to the extent that their policies provide coverage for [the Contractor's] indemnity liability. To hold otherwise would render the indemnity contract between the insureds completely ineffectual and would obviously not be a correct result, for it is the parties' rights and liabilities to each other which determine the insurance coverage; the insurance coverage does not define the parties' rights and liabilities one to the other." (*Chubb, supra,* 982 F.Supp. at p. 438.) To the same effect is *J. Walters Const., Inc. v. Gilman Paper Co.* (Fla.Dist.Ct.App. 1993) 620 So.2d 219, 220–221 [applying Georgia law].)

■ It is of no consequence that Hartford seeks contribution by way of equitable principles as opposed to enforcing the policies' "other insurance" provisions. Equitable contribution often serves as a substitute for that type of provision, especially where two or more insurers' policies contain conflicting terms. (See *Dart Industries, Inc. v. Commercial Union Ins. Co.* (2002) 28 Cal.4th 1059, 1078–1080 [124 Cal. Rptr. 2d 142, 52 P.3d 79]; *Century Surety Co. v. United Pacific Ins. Co., supra,* 109 Cal.App.4th at pp. 1255–1256; *Fireman's Fund Ins. Co. v. Maryland Casualty Co., supra,* 65 Cal.App.4th at pp. 1304–1307.) Hartford contends that such a conflict exists here. We do not address that contention given our conclusion that Mt. Hawley is not liable for any portion of the defense or settlement expenses in light of the indemnity provision in the subcontract.

■ This is not to say that, under *Rossmoor,* an indemnity agreement always prevails over provisions in an insurance policy, as for example where there are two levels of insurance coverage, primary and excess. As one court has noted:

"[T]he Supreme Court's decision in *Rossmoor* did not establish that in all cases where a contract for indemnification exists an insurer is entitled to bring a subrogation action on the agreement. . . . *Rossmoor* did not purport to establish a general rule that a contractual indemnification agreement between an insured and a third party takes precedence over well-established general rules of *primary and excess* coverage in an action between insurers repeatedly articulated by California appellate courts. . . . [¶] . . . [¶]

"[The appellant's] primary contention is that *Rossmoor* supports the theory that in *all* cases an indemnification agreement allows an insurer to be subrogated to the rights of its insured, even against an insurance company providing *excess* coverage. It is undisputed that the parties to the indemnity

agreement are not present and this is an action between *primary and excess* carriers as identified by their policies. The risks involved in providing *primary* coverage are different from those involved in issuing an *excess* policy. These differences are reflected in part by the premium costs. . . . This is not a case between two primary carriers which have each received premiums for bearing the loss which ultimately occurred; rather, this is an action between an *excess and a primary* carrier. . . . Under the circumstances, *Rossmoor*, a case involving a subrogation and indemnity dispute between *two primary carriers* and their insured is not controlling in the present case." (*Reliance Nat. Indemnity Co. v. General Star Indemnity Co.* (1999) 72 Cal.App.4th 1063, 1081–1083 [85 Cal.Rptr.2d 627] (*Reliance*), some italics added.)

And, as *Rossmoor* teaches, "of necessity, each case will turn on its own facts," "[requiring] an inquiry into the circumstances of the damage or injury and the language of the contract." (*Rossmoor, supra,* 13 Cal.3d at p. 633; see, e.g., *Shell Oil Co. v. National Union Fire Ins. Co.* (1996) 44 Cal.App.4th 1633, 1639–1644 [52 Cal.Rptr.2d 580] [scope of liability coverage afforded property owner as additional insured under contractor's insurance policy not limited by indemnity provision applicable to contractor under construction contract].)

## C. *The Travelers Decision*

We conclude that *Travelers, supra,* 93 Cal.App.4th 1142, is not dispositive here. In that case, the receiver of an apartment building in foreclosure, Lakeview Tower Apartments (Owner), retained the services of a property management company, Preferred Capital (Manager). The property management agreement required the Owner to obtain insurance coverage for the property and to include the Manager as an additional insured. The agreement also contained an indemnity provision stating that the Owner would indemnify the Manager against any claims arising out of the agreement.

The Owner was the named insured on a CGL policy issued by Travelers Casualty and Surety Company (Travelers or Owner's insurer), which also provided coverage for the Manager as an additional insured. The Manager was the named insured on a CGL policy obtained on its own from American Equity Insurance Company (American Equity or Manager's insurer). Both policies had virtually identical "other insurance" provisions. Each policy stated that "it was primary, except that it was excess over other valid and collectible insurance." (*Travelers, supra,* 93 Cal.App.4th at p. 1147.)

A tenant was injured at the apartment complex and filed suit against the Manager. The defense of the action was tendered to both insurers. The

Owner's insurer accepted the tender and settled the case for $31,000. The Manager's insurer did not participate in the defense or contribute to the settlement. The Owner's insurer filed suit against the Manager's insurer, seeking contribution for one-half of the expenses incurred in defending and settling the case. On cross-motions for summary judgment, the trial court ruled that the Owner's insurer was entitled to equitable contribution from the Manager's insurer.

On appeal, the Manager's insurer, relying on *Rossmoor*, *supra*, 13 Cal.3d 622, argued that its coverage was excess to the Owner's insurance because the indemnity provision in the property management agreement stated that the Owner would indemnify the Manager against all claims. The court rejected that argument and affirmed, stating:

"*Rossmoor* is distinguishable as an action primarily between two insureds on a contract for indemnity between the two. . . .

"Here, the action is between two insurers, both of whom have issued contracts of insurance covering the same insured, [the Manager]. Thus, the case looks more like the typical dispute between insurance carriers, which should be governed by general principles governing the interpretation and enforcement of 'other insurance' clauses between insurers.

"More importantly, subrogation of the insurer to the rights of the insured presupposes the insured, [the Manager], has a right to indemnity from the [Owner] under the indemnity agreement. This determination was never made below and those parties (the [Owner] and [the Manager]) are not parties to this action. Were [the Manager] to seek indemnity directly from the [Owner] under the agreement, it might be shown that [the Manager] was not entitled to indemnity on the grounds that it was actively or intentionally negligent in causing the victim's injury. . . . [¶] . . . [¶]

"In determining whether the contractual right to indemnification between parties to insurance contracts should control over the terms of the insurance contracts requiring proration, the Supreme Court in *Rossmoor* found certain equitable considerations controlling: that both companies accepted premiums with knowledge they might be called upon to satisfy a full judgment, and that to apportion the loss pursuant to 'other insurance' clauses would 'effectively negate the indemnity agreement' and impose liability upon the owner's insurer when the owner bargained with the contractor to avoid that result as part of the consideration for the construction agreement. . . . Here, too, both insurers were prepared to satisfy a full judgment, although both also agreed to apportion loss in case of other insurance at the same level. However, because it has not been established and we cannot say with certainty under the circumstances that [the Manager] is entitled to indemnity from the [Owner]

under the property management agreement, we never reach the equitable consideration that *Rossmoor* found controlling. Indeed, in these circumstances, the equitable considerations favor apportionment. Concern that the indemnity agreement between [the Manager] and the [Owner] would be negated by prorating the loss presupposes the determination that the [Owner] would be liable to indemnify [the Manager] under that agreement. That determination has never been made." (*Travelers, supra,* 93 Cal.App.4th at pp. 1156–1158, citation omitted, fn. omitted; see also *Reliance, supra,* 72 Cal.App.4th at pp. 1072, 1082 [language in insurance policies, not indemnity agreement, determined right to indemnity where dispute was between primary insurer and excess insurer, parties to indemnity agreement (the insureds) were not parties to action, and trial court in underlying suit did not decide agreement's applicability or effect].)

The court in *Travelers* also commented that it would be against public policy and inconsistent with equitable considerations if Travelers—which insured the Owner as a named insured and the Manager as an additional insured—were required to prove that the Manager was actively or intentionally negligent in order to recover equitable contribution from the Manager's own insurer, American Equity. (See *Travelers, supra,* 93 Cal.App.4th at p. 1157.)

We conclude that *Travelers* does not aid Hartford for several reasons.

### 1. *Determination of PCS's Fault*

In moving for summary judgment here, Mt. Hawley *did* raise the issue of liability under the indemnity provision, namely, whether Hartford's insured, Valley Metal, was obligated to indemnify Mt. Hawley's insured, PCS. Mt. Hawley established as a matter of law that PCS was not the sole cause of Cortez's injuries, and, thus, under the subcontract, Valley Metal had to indemnify PCS. As a consequence, the determination that *was not made* in *Travelers*—whether one insured was liable to another insured under an indemnity provision—*was made* in this case. *Travelers* does not preclude such a determination; the parties in *Travelers* simply chose not to adjudicate the matter.

As *Rossmoor* recognizes, "Whether conduct constitutes . . . [sole] negligence depends upon the circumstances of a given case and is ordinarily a question for the trier of fact; . . . [sole] negligence may be determined as a matter of law, however, when the evidence is so clear and undisputed that reasonable persons could not disagree." (*Rossmoor, supra,* 13 Cal.3d at p. 629.)

We can think of no reason why in an action between insurers—here, Hartford and Mt. Hawley—an insurer in Mt. Hawley's position should be

precluded from resolving the indemnity issue at the summary judgment stage. If anything, it will prevent a subsequent suit by one *insured* against *another insured* to determine the indemnity issue in order to obtain contribution.

█ In fact, PCS and Mt. Hawley have already filed an action against Valley Metal in superior court (*Mt. Hawley Insurance Co. v. Kowalski Sheet Metal, Inc.* (Super. Ct. L.A. County, 2004, No. BC314848)), seeking indemnification in light of the trial court's conclusion in this case that Mt. Hawley is liable for contribution. "Generally, courts will not allow parties to engage in circuitous action when the foreseeable end result is to put the parties back in the same position in which they began." (*Wal-Mart, supra,* 292 F.3d at p. 594.) That is exactly what will happen if Hartford recovers from Mt. Hawley here. In the other action, PCS would almost certainly establish that it was not the sole cause of the accident, thereby requiring Valley Metal to indemnify PCS. Mt. Hawley would then be subrogated to PCS's right to recover from Valley Metal the amount awarded to Hartford here. In essence, Hartford's recovery in this case would be returned to Mt. Hawley in the next one.

Our conclusion that the trial court in the present case could determine fault under the indemnity provision is supported by *St. Paul, supra,* 365 F.3d 263. There, in coverage litigation between the insurers of a resort's Owner and its Operator, the court held that the "indemnification provisions [in the Owner-Operator agreement] control the allocation of liability between the insurers" (*id.* at p. 270), making the insurer of the Owner liable for all defense and settlement expenses incurred in the underlying action, brought by a guest alleging food poisoning.

The Owner's insurer had "claim[ed] that because the underlying litigation was settled prior to trial, the record [did] not demonstrate whether indemnification would run . . . from the Owner to the Operator. . . . [The Owner's insurer] suggest[ed] that determination of indemnification obligations under the [Owner-Operator agreement was] best left for a subsequent action." (*St. Paul, supra,* 365 F.3d at p. 273.) The court of appeals disagreed, noting that most jurisdictions to have considered the question had concluded that "an indemnification agreement could relieve particular insurers of an obligation to pay, *without resort to a separate action to enforce the indemnification agreement* . . . ." (*Id.* at p. 272, italics added.)

The court in *St. Paul* continued:

"We reject [the Owner's insurer's] contention; the record evidence is more than sufficient to conclude that the settled liability . . . arose from acts or omissions on the order of ordinary negligence, for which [the Owner] is obligated under the [Owner-Operator agreement] to provide indemnification [to the Operator]. . . . [¶] . . . [¶]

". . . [The Owner's insurer] contends that the lack of any judicial determination that [the accident] resulted only from ordinary negligence prevents any classification of the settlement liability for indemnification purposes. But [the Owner's insurer] cites no authority for this proposition, and our independent review indicates that the weight of authorities would allow an indemnification claim to rely on a settled liability." (*St. Paul, supra,* 365 F.3d at pp. 273–274.)

■ Similarly, the trial court in this case could determine fault under the indemnity provision—specifically whether PCS was solely negligent—based on the summary judgment papers, notwithstanding that the underlying litigation had settled.

### 2. *Parties to the Action*

Nor does it matter that this suit is between the insurers, Mt. Hawley and Hartford, and that the insureds, PCS and Valley Metal, are not parties. As the Eighth Circuit stated in *Wal-Mart, supra,* 292 F.3d 583: "[W]e note that although the insureds were not parties in *Continental*[, *supra,* 238 F.3d 941], the Court nonetheless considered the indemnity agreement. . . . This fact defeats [the Distributor's insurer's] argument that consideration of the indemnity agreement is inappropriate because [the Distributor] was not successfully brought into this suit." (*Wal-Mart, supra,* 292 F.3d at p. 589.)

In litigation between insurers involving the right to contribution, the absence of the insureds presented no problems in *American Indem. Lloyds v. Travelers Property, supra,* 335 F.3d 429; *St. Paul, supra,* 365 F.3d 263; *Continental, supra,* 238 F.3d 941; or *Aetna Insurance Co. v. Fidelity & Cas. Co. of New York, supra,* 483 F.2d 471. In *Wal-Mart, supra,* 292 F.3d 583, only one of the insureds was a party to the litigation, and in *Chubb, supra,* 982 F.Supp. 435, the court resolved the coverage issue by way of cross-motions for summary judgment filed by the insurers and only one insured. If appropriate in a specific case, the insurers can engage in discovery before adjudicating the insureds' liability under an indemnity provision.

■ In short, the insureds do not always have to be parties to a contribution action by their insurers. That is the situation here. And as *Travelers* recognized, a court's resolution of the contribution issue must be "based on the particular circumstances of the case." (*Travelers, supra,* 93 Cal.App.4th at p. 1153.)

### 3. *The Additional Insured*

As stated, *Travelers* disfavored "requir[ing an insurer] to prove that its . . . additional insured . . . was actively or intentionally negligent in order to

succeed in recovering equitable contribution from [that insured's own insurer]." (*Travelers, supra,* 93 Cal.App.4th at p. 1157.)

But where a construction contract requires the subcontractor to indemnify the ·general contractor unless the general contractor is *solely* negligent, the subcontractor should be permitted to make such a showing of sole negligence in order to avoid having to pay indemnity. Otherwise, the subcontractor is left holding the bag even though it is entirely blameless. That is not equitable. As *Travelers* acknowledged, "the courts will assess whether the factual circumstances 'create[] a relationship between the indemnity contract and the insurance allocation issues . . . .' " (*Travelers, supra,* 93 Cal.App.4th at p. 1154.)

In *Rossmoor, supra,* 13 Cal.3d 622, one of the insurers, U.S. Fire, provided coverage for both the Contractor (the named insured) and the Owner (an additional insured). U.S. Fire attempted to avoid contribution altogether by arguing that the Owner was actively negligent, thereby making the Owner's own insurer, INA, completely responsible for defense costs and the judgment. (See *id.* at pp. 630–631, 634.) Yet, the high court expressed no concern that U.S. Fire's argument might be contrary to the interests of its additional insured.

The type of argument made by U.S. Fire is consistent with practical necessity. In the construction industry, when a property owner retains a contractor, the contractor is typically required by the parties' agreement to obtain a CGL policy for both itself, as the named insured, and the property owner, as an additional insured. The property owner often has a separate general liability policy of its own on which it is the named insured. (See Croskey et al., Cal. Practice Guide: Insurance Litigation, *supra,* ¶¶ 7:1407 to 7:1408.3, pp. 7E-2 to 7E-4; 4 Bruner & O'Connor, Construction Law (2002) Insurance, §§ 11.1, 11:56, pp. 5–6, 194–197.) A similar arrangement usually exists between a general contractor and a subcontractor. (Croskey et al., Cal. Practice Guide: Insurance Litigation, *supra,* ¶¶ 7:1408.5 to 7:1408.10, pp. 7E-4 to 7E-5; 4 Bruner & O'Connor, Construction Law, *supra,* §§ 11.1, 11:56, pp. 5-6, 194–197; *Golden Eagle Ins. Co. v. Insurance Co. of the West* (2002) 99 Cal.App.4th 837, 851–852 [121 Cal.Rptr.2d 682].)

To illustrate, in *National Union Fire Ins. Co. v. Nationwide Ins. Co.* (1999) 69 Cal.App.4th 709 [82 Cal.Rptr.2d 16], the subcontractor's insurer argued that it did not have to indemnify its additional insured, the general contractor, because the general contractor was *solely* negligent in causing injury to one of the subcontractor's employees. The court agreed. (*Id.* at pp. 717, 719–721.) In *St. Paul Fire & Marine Ins. Co. v. American Dynasty Surplus Lines Ins. Co.* (2002) 101 Cal.App.4th 1038 [124 Cal.Rptr.2d 818], the court reached the same conclusion. (*Id.* at pp. 1054–1060.)

█ In sum, PCS and Valley Metal negotiated a construction agreement requiring Valley Metal to indemnify PCS with certain exceptions not applicable here. Thus, Valley Metal is not entitled to indemnity from PCS. Nevertheless, Valley Metal's insurer seeks to recover from PCS's insurer with respect to a personal injury claim for which PCS, under the agreement, owes Valley Metal nothing. Based on our "inquiry into the [appropriate] circumstances" (*Rossmoor*, *supra*, 13 Cal.3d at p. 633), we conclude that "it is the intent of the parties as expressed in the agreement that should control" (*ibid.*). Accordingly, Valley Metal's insurer is not entitled to contribution.

## III

## DISPOSITION

The judgment is reversed. The trial court is directed to enter summary judgment in favor of appellant Mt. Hawley Insurance Company. Appellant is entitled to costs on appeal.

Spencer, P. J., and Ortega, J., concurred.

Respondent's petition for review by the Supreme Court was denied January 12, 2005.