Filed 4/17/13  U.S. Fire Ins. v. Arrowood Indemnity CA1/4
**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| UNITED STATES FIRE INSURANCE COMPANY,<br><br>        Plaintiff and Appellant,<br><br>v.<br><br>ARROWOOD INDEMNITY COMPANY et al.,<br><br>        Defendants and Respondents. | A133665<br><br>(San Francisco County Super. Ct. No. CGC09490808) |

Appellant United States Fire Insurance Company (U.S. Fire) paid various costs in defending and settling seven lawsuits alleging asbestos-related injuries.  It brought this case to recover a portion of these costs from respondents Arrowood Indemnity Company and United States Fidelity and Guaranty Company (USF&G).  Following a four-day bench trial, the trial court agreed that respondents were responsible for a portion of the costs and calculated their share to be $177,715.10.  In this appeal, U.S. Fire maintains that this amount was too low and that the trial court misapplied principles of insurance law by limiting respondents' liability on the basis of contractual indemnity provisions. We disagree and affirm.

1

# I.
## FACTUAL AND PROCEDURAL
## BACKGROUND

Union Electric Company entered into two contracts with Bechtel Corporation to build power-generating units at a Union Electric power plant in Labadie, Missouri. The contracts required Bechtel to engineer, construct, and start up these units.

Both contracts contained an identical indemnity clause, which provided: "Bechtel hereby assumes entire responsibility and liability for any and all damage, loss or injury, including death, of any kind or nature, whatever, to person or persons, or property or properties, caused by, resulting from or arising out of the performance of the work provided for in this Contract. Bechtel agrees to defend any suit or action brought against [Union Electric] based upon the foregoing injury or damage, and agrees further to pay all costs and expenses, including legal fees in connection with such suit or action; provided, however, that Bechtel's aforesaid indemnity and hold harmless agreement shall not be applicable to any loss, expense, damage, demand or claim or liability caused by the sole negligence of [Union Electric], its officers, representatives or employees; and provided further, that Bechtel's aforesaid indemnity and hold harmless agreement is for the exclusive benefit of [Union Electric] and in no event shall inure to the benefit of any third party."

Bechtel obtained insurance for its work at the Labadie plant from Industrial Indemnity Company, the predecessor to appellant U.S. Fire.

Bechtel was also the general contractor for the construction of another Union Electric plant in Missouri (the Rush Island plant), and it again obtained insurance from Industrial Indemnity. Industrial Indemnity issued an endorsement adding Union Electric as an insured for the project, providing that " 'this insurance on behalf of owner is primary insurance and any other insurance maintained by owner shall be specific excess insurance, notwithstanding condition XI, other insurance.' " The trial court concluded that this provision made Industrial Indemnity (and, by novation, U.S. Fire) the sole primary insurer for Union Electric's liabilities arising out of new construction at the Rush

Island plant. U.S. Fire does not challenge this finding on appeal, and we accept it as binding on this court. Our subsequent references to the "indemnity agreement" are to the provisions in the contracts quoted above, under which U.S. Fire, through its predecessor Industrial Indemnity, agreed to insure Union Electric for the construction at the Labadie and Rush Island plants.

Respondents Arrowood and USF&G provided general liability insurance to Union Electric. These policies covered various time periods from the 1950s through the 1980s, but neither respondent provided coverage for asbestos claims after September 30, 1989.

Seven lawsuits were filed by workers who alleged injuries from asbestos exposure while working at Union Electric facilities. These workers alleged that they were exposed to asbestos while working at various times at the Labadie, Rush Island, or other Union Electric plants. Union Electric's legal counsel learned through discovery in these lawsuits that the workers' claims focused heavily on asbestos exposure during new construction at Labadie and Rush Island. The defenses of these cases were therefore tendered to Bechtel's insurer U.S. Fire based on the indemnity agreement. U.S. Fire eventually paid a total of $1,374,384.38 in defense and settlement costs.[1]

U.S. Fire then brought this action against respondents Arrowood and USF&G, seeking declaratory relief and contribution. The main issue throughout the litigation has been the effect of the indemnity agreement on respondents' obligations to contribute to defense and settlement costs. In denying a motion for summary judgment filed by respondents, the trial court agreed with U.S. Fire that the indemnity agreement did not

---

[1] On March 23, 2012, this court granted U.S. Fire's application to file its opening brief and portions of its appendix under seal. In the public version of its opening brief, U.S. Fire redacts the amounts it paid in defense and settlement costs and cites to a sealed portion of the record containing an apportionment allocation table prepared below by respondents. U.S. Fire claims that disclosure of information contained in the table "could prejudice Union Electric's future defense against asbestos claims." But these same amounts are listed in the trial court's statement of decision included in the public version of the record filed with this court, which is available on the trial court's website. Because this information already is part of the public record, we include in our opinion the numbers listed in the statement of decision.

necessarily relieve respondents of all liability and concluded that questions of fact existed about the scope of the parties' duties to defend and the extent of liability.

At trial, U.S. Fire argued that all of the insurance companies shared a duty to defend the lawsuits and that respondents' duty arose because the workers alleged that they were exposed to asbestos at multiple Union Electric sites, including sites not covered by U.S. Fire insurance policies. U.S. Fire maintained that respondents were accordingly "joint[ly] and several[ly]" liable for defense and settlement costs. However, U.S. Fire did not specify how, exactly, those costs should be apportioned. Counsel at one point argued that if respondents had been defending the lawsuits, "we would all be in the suit and we would all be paying some established allocable share, time on the risk[2] or risk—limits times years, or something." Counsel later criticized allocating costs based on a "site-by-site analysis," adding, "So I don't know what the answer is, Your Honor, but it can't be month by month because months by months—trying to do it months by months, there is too much fatal uncertainty and ever-changing allegations of the time of exposure within a site. And we cannot do it by site, Your Honor, because there was, likewise, fatal uncertainty between the sites." The trial court observed in its statement of decision that "U.S. Fire did not propose a method for apportioning damages other than a pro rata share of all defense and indemnity costs for all lawsuits based upon policy limits and years of coverage."

For their part, respondents acknowledged that the lawsuits involved asbestos exposure at sites not covered by U.S. Fire, but they argued that they should be relieved of reimbursing defense and settlement costs that were attributable to claims arising out of exposure during construction of the Labadie and Rush Island plants because of the indemnity agreement.

---

[2] The " 'time on the risk' " method of allocating liability among primary insurers covering the same liability has been defined as "[a]pportionment based upon the relative duration of each primary policy as compared with the overall period during which the 'occurrences' 'occurred' . . . ." (*Stonewall Ins. Co. v. City of Palos Verdes Estates* (1996) 46 Cal.App.4th 1810, 1861.)

Respondents presented the testimony of an attorney witness who had represented Union Electric in about 200 matters, including five of the seven underlying lawsuits. He testified under seal about the evidence gathered and the exposure analysis conducted in those cases. He testified that in analyzing asbestos-injury claims, he considered the length of the project causing exposure, the years when the claimant worked on the project, and whether the claimant was a smoker. He also testified that asbestos was used less and less after the early 1970s, as more became known about its health hazards.

Based in large part on this testimony, respondents provided an "apportionment summary," which allocated defense and settlement costs between U.S. Fire, on the one hand, and both respondents, on the other, based on the plants involved and the nature and timing of the workers' exposure to asbestos. The trial court agreed with respondents that, while difficult, it was not impossible to apportion losses among the various power plants.[3] It made the following findings with regard to the seven underlying lawsuits:

*Bunton v. Union Carbide et al.*: U.S. Fire paid $17,995 in defense costs and $82,500 to settle a lawsuit brought against Union Electric and others for injury suffered by Paul Bunton. The trial court concluded that Bunton was injured by being exposed to asbestos while working for five months on the construction of the Labadie plant and while working four months at another Union Electric power plant.

*Capestro v. Amchem Products, Inc. et al.*: U.S. Fire paid $282,579.20 in defense costs and $375,000 to settle a lawsuit brought against Union Electric and others for injury suffered by Joseph Capestro. The trial court concluded that Capestro was injured by being exposed to asbestos while working on the construction of the Labadie plant, and was not injured by being exposed to asbestos at any other Union Electric facility.

*Farrar v. Nooter Corp. et al.*: U.S. Fire paid $41,882.19 in defense costs and $100,000 to settle a lawsuit brought against Union Electric and others for injury suffered

---

[3] The trial court pointed out that, "Juries do that [allocate liability] in every [asbestos] case. They will have multiple defendants and they have to allocate fault for each defendant, so they have to say 20 percent of the fault is attributable to company A, 30 percent to B, 40 percent to the Navy. Juries do that in every single case. If they do it in that situation, then I don't know why it's impossible to do it here."

5

by Homer Farrar. The trial court concluded that Farrar was injured by being exposed to asbestos while working 48 months on the construction of the Labadie plant, working 24 months on the construction of the Rush Island plant, performing repairs for 27 months at the Labadie plant before 1990, performing repairs for three months at the Labadie plant after 1990, and for working for several months at other Union Electric power plants, both before and after 1990.

*Maloney v. A.W. Chesterton et al.*: U.S. Fire paid $13,363.33 in costs to defend a lawsuit brought for injury suffered by Richard Maloney, but paid no settlement amount. The trial court concluded that Maloney was injured by being exposed to asbestos while working for 60 months on the construction of the Labadie plant, working for 18 months on the construction of the Rush Island plant, performing repairs for 11.5 months at two other United Electric power plants before 1990, and performing repairs for 6.5 months at yet another Union Electric power plant.

*Morris v. Avocet Enterprises, Inc. et al.*: U.S. Fire paid $1,464.60 in defense costs and $25,000 to settle a lawsuit brought against Union Electric and others for injury suffered by Billy Joe Morris. The trial court found that Morris was injured by being exposed to asbestos while working on the construction of the Labadie plant, and was not injured by being exposed to asbestos by working at any other Union Electric facility.

*Schlosser v. A.W. Chesterton, Inc. et al.*: U.S. Fire paid $9,600.06 in defense costs and $250,000 to settle a lawsuit brought against United Electric and others for injury suffered by Arlan Schlosser. The trial court found that Schlosser was injured by being exposed to asbestos while working for 45.25 months on new construction of the Labadie plant; for working 29 months on the construction of the Rush Island plant; for performing repairs and engaging in refueling work at five Union Electric power plants, including the Labadie and Rush Island plants, before 1990; and for performing repairs for 7.5 months at three Union Electric power plants, including the Labadie and Rush Island plants, after 1990.

*Silverstein v. A.W. Chesterton, Inc. et al.*: U.S. Fire paid no defense costs, but paid $175,000 to settle a lawsuit brought against Union Electric and others for injury suffered

6

by Morton Silverstein. The trial court found that Silverstein was injured by being exposed to asbestos while working a total of 24 months on the construction of the Labadie plant, and while working for 8.5 months on a different Union Electric plant.

In its statement of decision, the court concluded that U.S. Fire was entitled to equitable contribution from respondents, but only for the portion of U.S. Fire's payments attributable to asbestos exposure at Union Electric facilities other than exposure occurring during construction of the Labadie and Rush Island plants.

Based on this conclusion, the court ruled that U.S. Fire was entitled to no contribution in connection with *Capestro* and *Morris* because those claims related solely to the construction of the Labadie plant. As for the other five cases, the court concluded that U.S. Fire was entitled to equitable contribution from respondents in the total amount of $177,715.10, calculated as follows: (1) in *Bunton*, $2,267.63 of the $17,995 in defense costs and $12,688.50 of the $82,500 paid in settlement; (2) in *Farrar*, $25,602.58 of the $41,882.19 in defense costs and $61,130 of the $100,000 paid in settlement; (3) in *Maloney*, $624.01 of the $13,363.33 in defense costs (no amount was paid in settlement); (4) in *Schlosser*, $712.32 of the $9,600.06 in defense costs and $18,550 of the $250,000 paid in settlement; and (5) in *Silverstein*, $56,140 of the $175,000 paid in settlement (no defense costs were paid by U.S. Fire). These amounts were identical to the apportionment proposed by respondents, which was based on the duration of each plaintiff's work at each Union Electric plant; whether the plaintiff's work was performed before or after the effective date of relevant safety regulations—when the use of asbestos became less widespread; and whether the plaintiff's exposure occurred while repairing existing plants or while working on new plant construction, which typically involved greater risk of harm.

U.S. Fire timely appealed from the subsequent judgment.

7

## II.
### DISCUSSION

*A.  General Legal Principles.*

U.S. Fire argues that the trial court did not properly treat this as an equitable contribution case.  The general principles applicable in equitable contribution cases were summarized in *Hartford Casualty Ins. Co. v. Mt. Hawley Ins. Co.* (2004) 123 Cal.App.4th 278 (*Mt. Hawley*), which we quote at length:  " 'Equitable contribution is the right to recover, not from the party primarily liable for the loss, but from a co-obligor who shares such liability with the party seeking contribution.  In the insurance context, the right to contribution arises when several insurers are obligated to indemnify or defend the same loss or claim, and one insurer has paid more than its share of the loss or defended the action without any participation by the other.  Where multiple insurance carriers insure the same insured and cover the same risk, each insurer has independent standing to assert a cause of action against its coinsurers for equitable contribution when it has undertaken the defense or indemnification of the common insured.  Equitable contribution permits reimbursement to the insurer that paid on the loss for the excess it paid over its proportionate share of the obligation, on the theory that the debt it paid was equally and concurrently owed by the other insurers and should be shared by them pro rata in proportion to their respective coverage of the risk.  The purpose of this rule of equity is to accomplish substantial justice by equalizing the common burden shared by coinsurers, and to prevent one insurer from profiting at the expense of others. . . .

" 'This right of equitable contribution belongs to each insurer individually.  It is not based on any right of subrogation to the rights of the insured, and is not equivalent to " 'standing in the shoes' " of the insured. . . .  Instead, the reciprocal contribution rights of coinsurers who insure the same risk are based on the equitable principle that the burden of indemnifying or defending the insured with whom each has independently contracted should be borne by all the insurance carriers together, with the loss equitably distributed among those who share liability for it in direct ratio to the proportion each insurer's coverage bears to the total coverage provided by all the insurance [policies]. . . .

8

"As a matter of equity, insurers of the 'same risk' may sue each other for contribution. . . . This right is not a matter of contract, but flows ' "from equitable principles designed to accomplish ultimate justice in the bearing of a specific burden." ' . . . The idea is that the insurers are 'equally bound,' so therefore they 'all should contribute to the payment.' . . ." . . .

" 'Unlike subrogation [defined as the "substitution of another person in place of the creditor or claimant to whose rights he or she succeeds in relation to the debt or claim," *Mt. Hawley*, *supra*, 123 Cal.App.4th at p. 287], the right to equitable contribution exists independently of the rights of the insured. It is predicated on the commonsense principle that where multiple insurers or indemnitors share equal contractual liability for the primary indemnification of a loss or the discharge of an obligation, the selection of which indemnitor is to bear the loss should not be left to the often arbitrary choice of the loss claimant, and no indemnitor should have any incentive to avoid paying a just claim in the hope the claimant will obtain full payment from another coindemnitor.' " (*Mt. Hawley* at pp. 287-288, italics omitted.) " '[T]he aim of equitable contribution is to apportion a loss between two or more insurers who cover the same risk, so that each pays its fair share and one does not profit at the expense of the others.' [Citations.]" (*Id.* at p. 288; see also *Fireman's Fund Ins. Co. v. Maryland Casualty Co.* (1998) 65 Cal.App.4th 1279, 1293.)

"The application of equitable considerations must be made on a case-by-case basis, 'in light of varying equitable considerations which may arise, and which affect the insured and the primary and excess carriers, and which depend upon the particular policies of insurance, the nature of the claim made, and the relation of the insured to the insurers.' [Citation.]" (*North American Capacity Ins. Co. v. Claremont Liability Ins. Co.* (2009) 177 Cal.App.4th 272, 295.)

*B. Standard of Review.*

A judgment of the trial court is presumed correct, and it is appellant's burden to demonstrate error. (*Denham v. Superior Court* (1970) 2 Cal.3d 557, 564; *Cahill v. San Diego Gas & Electric Co.* (2011) 194 Cal.App.4th 939, 956.) Because the proper

9

allocation of costs in an equitable contribution action among insurers is within a trial court's broad discretion (*Maryland Casualty Co. v. Nationwide Mutual Ins. Co.* (2000) 81 Cal.App.4th 1082, 1093-1094), we review the trial court's order for an abuse of that discretion. (*Cahill* at p. 957.) "Under that standard, there is no abuse of discretion requiring reversal if there exists a reasonable or fairly debatable justification under the law for the trial court's decision or, alternatively stated, if that decision falls within the permissible range of options set by the applicable legal criteria." (*Ibid.*) The abuse of discretion standard is particularly appropriate in equitable contribution cases, where there are "no 'hard and fast "bright line" ' rules for the proper method of allocating defense costs among coinsurers, . . . a matter left to the sound equitable discretion of the trial court." (*North American Capacity Ins. Co. v. Claremont Liability Ins. Co.*, *supra*, 177 Cal.App.4th at pp. 295-296.)

U.S. Fire contends that the outcome of trial turned on the interpretation of legal instruments, an issue of law this court reviews de novo. Even where an appellate court reviews an issue de novo, such review "is limited to issues which have been adequately raised and supported in [appellant's] brief." (*Reyes v. Kosha* (1998) 65 Cal.App.4th 451, 466, fn. 6.) Although U.S. Fire makes general claims that the trial court committed "legal error," some of its arguments lack adequate factual support or reasoned argument demonstrating that the trial court erred, as we discuss below.

*C. Effect of Indemnity Agreement.*

Respondents argued below, and the trial court agreed, that the indemnity agreement limited respondents' obligation to contribute because respondents were not coinsurers of loss attributable to the Labadie and Rush Island plants, following *Mt. Hawley*, *supra*, 123 Cal.App.4th 278. In *Mt. Hawley*, a subcontractor agreed to indemnify a general contractor for claims and liabilities arising out of the subcontractor's performance and to secure a commercial general liability policy listing the subcontractor as the named insured and the general contractor as an additional insured. (*Id.* at p. 281.) After an employee of the subcontractor was injured while construction was in progress, the employee sued the general contractor, and the subcontractor's insurer provided a

10

defense and settled the case using its own funds. (*Ibid.*) The subcontractor's insurer then filed suit against the general contractor's insurer, seeking payment of half of the defense and settlement expenses, under a theory of equitable contribution. (*Id.* at pp. 281, 285-286.) The trial court granted summary judgment in favor of the subcontractor's insurer and awarded that insurer more than $136,000. (*Ibid.*)

The appellate court reversed. (*Mt. Hawley*, *supra*, 123 Cal.App.4th at pp. 281, 305.) It held that because the general contractor was not liable to the subcontractor under the parties' indemnity provision, it followed that the general contractor's insurer was not liable to the subcontractor's insurer. (*Id.* at pp. 282, 288-289, 292.) "As a general matter, 'the courts will assess whether the factual circumstances "create[] a relationship between the indemnity contract and the insurance allocation issues . . . ." ' [Citation.]" (*Id.* at p. 289.) Because the subcontractor in *Mt. Hawley* had agreed to indemnify and hold harmless the general contractor absent the general contractor's sole negligence or willful misconduct, and the general contractor was shown not to be solely negligent or have engaged in willful misconduct, it followed that the general contractor's insurer was not required to provide equitable contribution. (*Id.* at pp. 289, 291-292.) To require the general contractor's insurer to pay the subcontractor's insurer, when the general contractor was not liable for anything due to the indemnity provision, would effectively negate the indemnity agreement, and would be "inconsistent with ' " 'equitable principles designed to accomplish ultimate justice,' " ' [would not be] 'predicated on [any] commonsense principle,' and [would] not further the goal that each insurer pay its '*fair share*.' [Citation.]" (*Id.* at p. 292, italics added by *Mt. Hawley* court; see also *Rossmoor Sanitation, Inc. v. Pylon, Inc.* (1975) 13 Cal.3d 622, 634-635 [indemnity provision affects allocation of liability in insurance action even where "other insurance" provision available].)

Here, the trial court concluded that *Mt. Hawley* controlled and ruled that U.S. Fire, as the insurer for Bechtel, was solely responsible for the defense and settlement costs for asbestos-related injuries arising out of the construction of the Labadie plant. Unlike the situation in a typical equitable contribution action, where insurers *equally* and

11

*concurrently* owe on a debt paid and share a common burden as *coinsurers* (*Mt. Hawley*, *supra*, 123 Cal.App.4th at p. 287), the trial court here concluded that the parties were *not* coinsurers, because there was no overlapping coverage.[4] "To hold otherwise[] would be unreasonable, arbitrary and contrary to the intent of the underlying parties in entering into the indemnity agreement for the Labadie construction," the court concluded. Likewise, because U.S. Fire agreed that it would be the primary insurer for liability arising out of new construction at the Rush Island plant, U.S. Fire was not entitled to contribution for defense or settlement for any asbestos-related injuries arising out of the plant's construction. The trial court then ruled that U.S. Fire was entitled to equitable contribution from respondents for defense and indemnity costs to the extent that those payments were for injuries resulting from exposure at Union Electric facilities other than during new construction of the Labadie or Rush Island plants. We conclude that this was an eminently reasonable approach under *Mt. Hawley* and in light of the circumstances of this case.

### D. Duty to Defend.

U.S. Fire argues that the trial court's ruling "revealed a fundamental misunderstanding of the insurance law principles that govern a contribution action among carriers, a misunderstanding that infected all of the court's conclusions with reversible error." Appellant places much emphasis on respondents' legal duty to defend the underlying lawsuits. "[T]he insurer's duty to defend [a lawsuit] runs to claims that are merely potentially covered, in light of facts alleged or otherwise disclosed. [Citations.] It entails the rendering of a service, viz., the mounting and funding of a defense [citations] in order to avoid or at least minimize liability [citation]. It arises as soon as

---

[4] U.S. Fire contends that respondents "withdrew" the defense that they were not coinsurers. It cites a portion of the trial court's statement of decision stating that "[i]ssues not resolved in this Statement of Decision were withdrawn by the parties." The trial court specifically resolved the issue of whether the parties were coinsurers, the primary disputed issue at trial, and concluded that they were not, because there was no overlapping coverage. Although other defenses were dropped, we do not consider the issue of whether the parties were coinsurers to have been "withdrawn."

tender is made. [Citation.] It is discharged when the action is concluded. [Citation.] It may be extinguished earlier, if it is shown that no claim can in fact be covered. [Citation.] If it is so extinguished, however, it is extinguished only prospectively and not retroactively: before, the insurer had a duty to defend; after, it does not have a duty to defend further. [Citations.] [¶] Obviously, the insurer's duty to defend is broader than its duty to indemnify. [Citations.]" (*Buss v. Superior Court* (1997) 16 Cal.4th 35, 46-47.) "If any facts stated or fairly inferable in the complaint, or otherwise known or discovered by the insurer, suggest a claim potentially covered by [an insurance] policy, the insurer's duty to defend arises and is not extinguished until the insurer negates all facts suggesting potential coverage. On the other hand, if, as a matter of law, neither the complaint nor the known extrinsic facts indicate any basis for potential coverage, the duty to defend does not arise in the first instance." (*Scottsdale Ins. Co. v. MV Transportation* (2005) 36 Cal.4th 643, 655.) "When a duty to defend is shown, nonparticipating coinsurers are presumptively liable for both the costs of defense and settlement." (*Safeco Ins. Co. of America v. Superior Court* (2006) 140 Cal.App.4th 874, 880 (*Safeco*).) "Although an insurer may have a duty to defend, it may ultimately have no duty to indemnify—either because no damages were awarded or because the actual judgment was for damages not covered by the policy. [Citations.]" (*Armstrong World Industries, Inc. v. Aetna Casualty & Surety Co.* (1996) 45 Cal.App.4th 1, 108 (*Armstrong*).)

When a complaint states multiple claims, some of which are potentially covered by an insurance policy and some of which are not, it is a " 'mixed action.' " In such a case, "the insurer has a duty to defend as to the claims that are at least potentially covered, having been paid premiums by the insured therefor, but does not have a duty to defend as to those that are not, not having been paid therefor. This conclusion is in line with the 'general rule' that '[w]hen a complaint in an action . . . states different causes of action . . . against the insured, one of which is within . . . coverage . . . and others of which may not be, the insurer is bound to defend with respect to those which, if proved, would be within . . . coverage.' [Citations.]" (*Buss v. Superior Court*, *supra*, 16 Cal.4th at p. 48, italics omitted.) Despite this rule, our Supreme Court has held that, "in a

13

'mixed' action,' the insurer has a duty to defend the action in its entirety." (*Ibid.*) However, the insurer may thereafter seek reimbursement from the insured for defense costs that can be attributed to claims that are not even potentially covered. (*Id.* at p. 53.) Here, the trial court followed a similar model by allocating defense and settlement costs after taking into account the nature, severity, and length of exposure to asbestos at the various Union Electric plants involved in the underlying suits.

The trial court accepted U.S. Fire's contention that the allegations in the underlying suits gave rise to an initial duty by respondents to defend the underlying cases. But it concluded that any such duty did not affect the proper way to allocate the costs of defense and settlement payments among the parties: "If[,] for example, Arrowood and USF&G had a duty to defend and did not defend, or if they had participated in the defense and the parties were now seeking to allocate their respective shares of the costs of defense and settlements, the method of allocation would be the same."

We understand U.S. Fire's argument to be that because respondents had an initial duty to defend the underlying lawsuits, it necessarily follows that the trial court used an incorrect method of allocating defense costs and settlement amounts among the parties. In making this argument, U.S. Fire focuses almost entirely on respondents' duties when the underlying lawsuits were filed and defenses tendered, and suggests that these duties control respondents' contribution rights for all time, no matter what information was subsequently learned, and no matter the effect of the indemnity agreement.

U.S. Fire's approach is not supported by the case law upon which it relies. For example, citing *Safeco*, *supra*, 140 Cal.App.4th 874, appellant claims that "all carriers with a duty to defend are obligated to equitably contribute to the defense." In *Safeco*, a settling insurer sued a nonparticipating insurer for equitable contribution after the settling insurer paid the costs of defense and settlements of 17 underlying property damage lawsuits. (*Id.* at p. 877.) In denying the settling insurer's motion for summary judgment, the trial court concluded that because the underlying complaints were " 'very general' " there were questions whether damages occurred when the nonparticipating insurer's

14

policies were in effect and thus whether there was a corresponding duty to defend. (*Id.* at p. 878.) The trial court further ruled that the settling insurer would not be entitled to equitable contribution until the insurer established *as a matter of law* that the nonparticipating insurer's policy covered the loss. (*Ibid.*)

The appellate court thereafter granted the settling insurer's petition for a writ of mandate. (*Safeco supra*, 140 Cal.App.4th at pp. 878, 881.) It held that "in an action for equitable contribution by a settling insurer against a nonparticipating insurer, the settling insurer has met its burden of proof when it makes a prima facie showing of coverage under the nonparticipating insurer's policy—the same showing necessary to trigger the recalcitrant insurer's duty to defend—and that the burden of proof then shifts to the nonparticipating insurer to prove the absence of actual coverage. [Citation.]" (*Id.* at p. 881.) Here, respondents *met* their burden by demonstrating that the indemnity agreement relieved them of any duty to cover losses sustained during construction at the Labadie and Rush Island plants and by presenting evidence on the extent to which the plaintiffs were exposed to asbestos while working on the construction of those plants.

Moreover, *Safeco* was a writ proceeding that did not address any particular allocation method—the main issue on appeal in this case. (*Safeco, supra*, 140 Cal.App.4th at pp. 881-882.) Instead, it focused on the showing necessary to obtain contribution for settlement payments as opposed to defense costs. (*Id.* at p. 879.) As for defense costs, the parties agreed that a settling insurer need only establish a nonparticipating coinsurer's *potential* for coverage under the coinsurer's policy in order to obtain contribution. (*Ibid.*) To the extent that U.S. Fire contends that under *Safeco* it was entitled to contribution for defense costs, as opposed to settlement payments, we disagree. Respondents established that there was no *potential* for coverage for injuries sustained during new construction at the Labadie and Rush Island plants. This case is thus more akin to *Buss v. Superior Court*, *supra*, 16 Cal.4th 35, a " 'mixed' action," where the court held that an insured could recover defense costs "that can be allocated solely to the claims that are not even potentially covered." (*Id.* at p. 53; see also *Mt. Hawley*, *supra*, 123 Cal.App.4th at p. 292.)

U.S. Fire contends that *Mt. Hawley*'s analysis regarding indemnity agreements is inapplicable here because *Mt. Hawley* was a "single-site, single-injury and complete indemnity situation," whereas this case involved five different sites. In other words, U.S. Fire concedes that *Mt. Hawley* would apply if a construction worker had been injured in a single accident at the Labadie plant. But here, U.S. Fire claims that the trial court should have found that U.S. Fire and respondents were "co-insurers," necessitating that "allocation issue[s]" be "analyzed under insurance law principles," because U.S. Fire had assumed liability at only two of five implicated sites. We disagree with the notion that in allocating defense costs and settlement payments the trial court was required to ignore the indemnity agreement and the facts that were established in applying it, just because plaintiffs alleged damages at multiple locations.

This is particularly true in the *Capestro* and *Morris* lawsuits, where the trial court found that plaintiffs suffered injuries solely related to new construction at the Labadie plant. The *Capestro* complaint alleged injury only at the Labadie plant.[5] Although the *Morris* complaint alleged injury suffered at plants other than those covered by U.S. Fire's policies, it would not be equitable to find that U.S. Fire was a coinsurer in that lawsuit simply because plaintiff initially alleged that he suffered injury at other facilities. In its opening brief, U.S. Fire does not directly challenge the trial court's factual finding that plaintiffs in *Capestro* and *Morris* suffered injuries only at Labadie or offer any reasoned argument why it is entitled to contribution for claims covered solely by the indemnity agreement.[6]

---

[5] There was a factual dispute at trial over whether some of Capestro's asbestos exposure occurred after new construction was complete, when Capestro serviced a soda vending machine at the Labadie plant. Respondents provided substantial evidence that Capestro's duties servicing the machine did not contribute to his asbestos-related illness.

[6] U.S. Fire belatedly asserts in its reply brief that even if it is not entitled to contribution of the amount paid to settle the *Capestro* and *Morris* lawsuits, it must be awarded its defense costs for those suits. "Points raised in the reply brief for the first time will not be considered, unless good reason is shown for failure to present them before." (*Campos v. Anderson* (1997) 57 Cal.App.4th 784, 794, fn. 3.)

16

U.S. Fire also relies on *Scottsdale Ins. Co. v. MV Transportation*, *supra*, 36 Cal.4th 643, but this case also supports the trial court's order. In *Scottsdale*, an insurance company defended its insured against a third party lawsuit under a reservation of rights to recover defense costs in the event that it was determined that the company owed no defense. (*Id.* at p. 649.) The company was permitted to recover defense costs from its insured because it was later determined as a matter of law that the insurance company's policies in fact afforded no potential coverage. (*Ibid.*) The Supreme Court noted that in such a situation, the insurance company's duty to defend was never " 'extinguished' "; instead, it never arose in the first place. (*Ibid.*) "The insured pays for, and can reasonably expect, a defense against third party claims that are potentially covered by its policy, but no more. Conversely, the insurer does not bargain to assume the cost of defense of claims that are not even potentially covered. To shift these costs to the insured does not upset the contractual arrangement between the parties. Thus, where the insurer, acting under a reservation of rights, has prophylactically financed the defense of claims as to which it owed no duty of defense, it is entitled to restitution. Otherwise, the insured, who did not bargain for a defense of noncovered claims, would receive a windfall and would be unjustly enriched. [Citation.]" (*Id.* at p. 659.) Although this is an equitable contribution action and not an action against an insured, we find this reasoning useful here. It was not improper for the trial court to decline ordering respondents to contribute to defense and settlement costs for claims that were not potentially covered simply because the complaints alleged other potentially covered claims.[7]

In a related argument, U.S. Fire contends that because asbestos bodily injury claims " 'trigger' " insurance policy coverage throughout successive policy periods, respondents had a duty to defend in this matter. Where successive comprehensive

---

[7] U.S. Fire's reliance on *Maryland Casualty Co. Nationwide Mutual Ins. Co.*, *supra*, 81 Cal.App.4th 1082 and *Fireman's Fund Ins. Co. v. Maryland Casualty Co.*, *supra*, 65 Cal.App.4th 1279 is equally misplaced. Both cases involved situations where insurers sought contribution from insurance companies *both liable* for the same loss and did not consider the effect of indemnity agreements relieving them from that liability. (*Maryland Casualty* at p. 1093; *Fireman's Fund* at p. 1289.)

general liability policy periods are implicated, "bodily injury . . . which is continuous or progressively deteriorating throughout several policy periods is potentially covered by all policies in effect during those periods." (*Montrose Chemical Corp. v. Admiral Ins. Co.* (1995) 10 Cal.4th 645, 689.) U.S. Fire apparently contends that respondents' coverage for some of the time periods implicated in the underlying complaints triggered a duty to defend the entire complaints because asbestos injury is a continuing injury and it can never be established which precise asbestos fiber led to a particular plaintiff's asbestos-related injury. (E.g., *Armstrong*, *supra*, 45 Cal.App.4th at p. 41 [asbestos-related diseases " 'insidious diseases with delayed manifestations' "].) U.S. Fire reasons that this makes respondents jointly liable for the entire underlying injury that occurred over time, as opposed to the discrete injury in *Mt. Hawley*, *supra*, 123 Cal.App.4th at page 283, which occurred when a worker fell into an open elevator shaft on a single occasion. Again, this ignores the effect of the indemnity agreement and the fact that damages are frequently apportioned among defendants in asbestos cases. (*Armstrong*, *supra*, 45 Cal.App.4th at pp. 57-58.)

It may be true, as the trial court assumed, that respondents had a duty to defend at least some of the underlying complaints because they involved "mixed actions." But it does not follow that the trial court erred in allocating costs and settlement among the parties, as illustrated by the cases upon which U.S. Fire relies. In *Armstrong*, *supra*, 45 Cal.App.4th 1, a lengthy opinion from Division One of this court addressing coordinated asbestos proceedings, the court analyzed when bodily injury occurs for purposes of triggering insurance coverage. (*Id.* at p. 41.) Applying our Supreme Court's decision in *Montrose Chemical Corp. v. Admiral Ins. Co.*, *supra*, 10 Cal.4th 645, *Armstrong* affirmed the trial court's ruling that all of a policyholder's policies in effect from first exposure to asbestos until either date of death or date of claim, whichever occurs first, are triggered with respect to an asbestos-related bodily injury claim. (*Armstrong*, *supra*, at pp. 43-45.)

*Armstrong* went on to conclude that an insured must be indemnified by one insurer for the full extent of loss up to the policy's limits, but that liability was properly

18

apportioned among all insurers "based upon the policy limits and the years of coverage." (*Armstrong*, *supra*, 45 Cal.App.4th at p. 49.) " 'Allocation of the cost of indemnification once several insurers have been found liable to indemnify the insured for all or some portion of a continuing injury or progressively deteriorating property damage requires application of principles of contract law to the express terms and limitations of the various policies of insurance on the risk. [Citation.]' " (*Id.* at p. 51, quoting *Montrose Chemical Corp. v. Admiral Ins. Co.*, *supra*, 10 Cal.4th at p. 681, fn. 19.) *Armstrong* rejected the insurance companies' claims that successive insurers share joint and several liability. (*Armstrong* at p. 55.)

U.S. Fire points out that there are "established allocation methodologies for contribution actions under California law." (Initial capitals and boldface omitted; see *Maryland Casualty Co. v. Nationwide Mutual Ins. Co.*, *supra*, 81 Cal.App.4th at p. 1094 [courts have developed several methods to equitably apportion loss].) It contends that had the trial court correctly analyzed the duty to defend, the court would have used a "time on the risk methodology" (*ante*, fn. 2) and thus allocated the "vast majority of the responsibility for the underlying claims" to respondents. U.S. Fire does not define "vast majority" or explain how the "time on the risk methodology" should have been applied in this case. It likewise accuses the trial court of "ignor[ing]" relevant insurance policies but does not explain how examining them would have led to a different result. U.S. Fire is perhaps hinting that its contribution award should have been larger because respondents insured Union Electric over several decades, while the construction period covered by the indemnity period was shorter. But "[s]imply hinting at an argument and

leaving it to the appellate court to develop it is not adequate."[8] (*Cryoport Systems v. CNA Ins. Cos.* (2007) 149 Cal.App.4th 627, 633.)

U.S. Fire does concede that it is liable for "***some portion***" (original boldface) of each claim by virtue of the indemnity agreement, but that it "simply asserts that the indemnity agreements be limited to their terms—they apply to liability arising out of only two of the five sites [implicated in the parties' lawsuits] (and each claimant was exposed at both indemnified and non-indemnified sites)." As was the case in the trial proceedings, it is still unclear what exact relief U.S. Fire seeks. It asks this court to remand the matter "with instructions to allocate the parties' respective coverage obligations under insurance principles and not to treat this as an underlying asbestos trial." At one point it states that "there is no 'exception' to the joint and several defense obligation for recalcitrant insurers that elect not to defend but await a contribution action after the fact," apparently suggesting that respondents are jointly and severally liable for the entire amount U.S. Fire paid. It later states that the trial court "was required to examine 'the nature of the claim, the relation of the insured to the insurers, the particulars of each policy and any other equitable considerations,' " quoting *Truck Ins. Exchange v. Unigard Ins. Co.* (2000) 79 Cal.App.4th 966, 974. But a fair reading of the trial court's statement of decision reveals that the court *did* take many, if not all, of those factors into account. It considered the nature and timing of the workers' claims, the relation of the parties to Bechtel and Union Electric, and the particulars of the policies (including the indemnity agreement).

---

[8] In a footnote in its reply brief and then again at oral argument, U.S. Fire argued that the trial court's allocation method was improper because expenditures related to post-1990 injuries were "somehow [made] U.S. Fire's exclusive responsibility" even though none of the insurance policies covered asbestos-related injuries after that date. We reject this argument for two reasons. First, we decline to consider arguments raised for the first time in reply briefs. (See *Campos v. Anderson*, *supra*, 57 Cal.App.4th at p. 794, fn. 3.) Second, we cannot conclude on the record before us that the trial court abused its discretion in declining to attribute a portion of post-1990 expenditures to Arrowood and USF&G, especially because U.S. Fire has never proposed a specific alternative allocation method and it fails to quantify how it was supposedly harmed by the purported allocation error.

20

U.S. Fire repeatedly directs this court to the following excerpt from an insurance treatise regarding equitable contribution: "The sharing of defense costs will typically be pro rata because every insurer that *potentially* covers the risk owes an immediate and complete defense [citation]. On the other hand, an insurer's share of the indemnity obligation will depend on whether there is *actual* coverage and may vary depending on equitable considerations such as policy limits, time on the risk, etc. [citation]." (Croskey et al., Cal. Practice Guide: Insurance Litigation (The Rutter Group 2012) ¶ 8:67.1, p. 8-29, original italics.) But the treatise underscores the importance of flexibility in allocating responsibility by emphasizing that there is "*no fixed rule* for allocating defense and indemnity costs . . . ." (Croskey et al., *supra*, ¶ 8:67, p. 8-28, italics added; see also *Maryland Casualty Co. v. Nationwide Mutual Ins. Co.*, *supra*, 81 Cal.App.4th at p. 1094 ["no single required method of apportionment" in equitable contribution case].)

Trial courts have great latitude in apportioning defense and settlement costs in contribution actions, and U.S. Fire has failed to demonstrate that the trial court improperly apportioned them in this case.

III.
DISPOSITION

The judgment is affirmed. Respondents shall recover their costs on appeal.


_____
Humes, J.


We concur:


_____
Reardon, Acting P.J.


_____
Rivera, J.

21